# IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| MESO SCALE DIAGNOSTICS, LLC., et al., | § § § § § | No. 200, 2020 |
| Plaintiffs Below, Appellants, | § § § | |
| v. | § § § | Court Below: Court of Chancery of the State of Delaware |
| ROCHE DIAGNOSTICS GMBH, et al., | § § § § | C.A. No. 2019-0167 |
| Defendants Below, Appellees. | § § § | |

Submitted: December 9, 2020
Decided: February 8, 2021

Before **VALIHURA**, **VAUGHN**, **TRAYNOR**, **MONTGOMERY-REEVES**, Justices and **RANJI**, Judge,[*] constituting the Court *en Banc*.

Upon appeal from the Court of Chancery of the State of Delaware. **AFFIRMED**.

David L. Finger, Esquire, Finger & Slanina, Wilmington, Delaware, William S. Consovoy, Esquire, J. Michael Connolly, Esquire (*argued*), Consovoy McCarthy PLLC, Arlington, Virginia, Patrick Strawbridge, Esquire, Consovoy McCarthy PLLC, Boston, Massachusetts for Appellants.

Matthew E. Fischer, Esquire, Timothy R. Dudderar, Esquire, J. Matthew Belger, Esquire, Andrew H. Sauder, Esquire, Potter Anderson & Corroon LLP, Wilmington, Delaware; *Of Counsel* Thomas L. Shriner, Jr., Esquire (*argued*), James T. McKeown, Esquire, Foley & Lardner LLP, Milwaukee, Wisconsin for Appellees.

---

[*] Sitting by designation pursuant to Del. Const. Art. IV, § 12 and Supreme Court Rules 2(a) and 4(a) to complete the quorum.

***PER CURIAM:***

In 2010, Appellants Meso Scale Diagnostics, LLC and Meso Scale Technologies, LLC (collectively "Meso") filed suit in the Court of Chancery against Appellee entities Roche Diagnostics GmbH, Roche Diagnostics Corp., Roche Holding Ltd., IGEN LS LLC, Lilli Acquisition Corp., IGEN International, Inc., and Bioveris Corp. (collectively "Roche"), all of which are or were affiliates or subsidiaries of the F. Hoffmann -- La Roche, Ltd. family of pharmaceutical and diagnostics companies. Meso alleged two counts of breach of contract. Roche prevailed at trial, and this Court affirmed the judgment in 2014.

On February 28, 2019, Meso brought a new action asking the court to reopen the case, vacate the judgment entered after trial, and order a new trial. Meso alleged that the Vice Chancellor who decided its case four years earlier had an undisclosed disabling conflict, namely, that Roche's counsel had been simultaneously representing him in an unrelated federal suit challenging the constitutionality of Delaware's law providing for confidential business arbitration in the Court of Chancery, 10 *Del. C.* § 349 ("Section 349"). In that federal litigation, which ended in 2014, the Chancellor and Vice Chancellors of the Court of Chancery, as the parties responsible for implementing the challenged statute, were nominal defendants (hereinafter, the "Judicial Officers").

The Court of Chancery denied relief and dismissed the action. Meso appeals.

For the following reasons, we AFFIRM the judgment of the Court of Chancery.

2

## I.  Factual and Procedural Background

Though this case reaches us as an appeal from the dismissal of Meso's complaint granting Roche's motion pursuant to Court of Chancery Rule 12(b)(6), Meso's "complaint" is, in effect, substantively a motion for relief from a judgment under Court of Chancery Rule 60(b), and in particular, under subparagraphs (b)(4) and (b)(6).  Meso's request for relief was restyled as a separate action for the convenience and at the request of the trial court.  Roche's corresponding dismissal motion likewise presents, in effect, its opposition to the Rule 60(b) arguments raised by Meso.  The Court of Chancery treated the motion substantially as one seeking Rule 60(b) relief.[1]

We take the facts as pled by Meso.[2]  In so doing, we defer only to those facts Meso alleged in its pleading and the reasonable inferences therefrom.[3]  We otherwise rely on the trial court's recitation of the facts.

---

[1] *Meso Scale Diagnostics, LLC v. Roche Diagnostics GMBH et al.*, Del. Ch. C.A. No. 2019-0167, at 19 (May 18, 2020) (Telephone Rulings of the Court on Defendants' Motion to Dismiss) [Notice of Appeal Ex. A, hereinafter, "Order"] (stating that "this isn't a vanilla 12(b)(6) motion.  Rather, it is a motion that challenges a claim for extraordinary relief under Rule 60(b), that happens to have been sought by complaint rather than by motion.").

[2] *See generally* App. to Op. Br. at A017–28 (Complaint).

[3] This accords with the deference given to well-pleaded facts under Rule 12(b)(6):

> Our review is limited to the well-pleaded allegations contained in the complaint. We accept all well-pleaded allegations as true, but we ignore conclusory allegations that lack specific supporting factual allegations.  Finally, throughout our examination of dismissals under Rule 12(b)(6), we remain heedful of our duty to draw all reasonable inferences in favor of the non-movant. . . .

*Ramunno v. Cawley*, 705 A.2d 1029, 1034 (Del. 1998) (internal citations and footnotes omitted).

Meso sued Roche on June 22, 2010 alleging two counts of breach of contract ("Meso Litigation").[4] Then-Attorney Andre Bouchard represented Roche in that action, while Vice Chancellor Parsons presided over the case. On April 8, 2011, the Vice Chancellor denied Roche's motion to dismiss the Meso Litigation.[5]

On October 25, 2011 the Delaware Coalition for Open Government, Inc. (the "Coalition") filed suit in the United States District Court for the District of Delaware against the State of Delaware, as well as the Court of Chancery and the Judicial Officers, including Vice Chancellor Parsons ("*DelCOG* Litigation").[6]

The Coalition asserted a cause of action under 42 U.S.C. § 1983, the federal civil rights statute. It alleged no specific misconduct by Vice Chancellor Parsons. Rather, it alleged that Section 349 deprived the Coalition of its right to public access to judicial proceedings under the First Amendment of the United States Constitution. The Coalition sought a declaration to that effect, as well as injunctive relief barring further arbitrations under the statute and rules. It also sought to unseal the records of prior arbitrations conducted pursuant to Section 349.

The Coalition's complaint included a prayer for attorney's fees and a residual prayer for "such other and further relief as the Court deems fair and just."[7] Aside from this

---

[4] App. to Op. Br. at A018 (Complaint).

[5] *Meso Scale Diagnostics, LLC v. Roche Diagnostics GMBH*, 2011 WL 1348438, at *1 (Del. Ch. Apr. 8, 2011).

[6] *See generally* App. to Op. Br. at A030–34 (*DelCOG* Complaint).

[7] *Id*. at A34.

mention of attorney's fees, there is no other indication in the record that the Coalition sought to recover damages, and Meso made clear that Vice Chancellor Parsons did not face the prospect of money damages or other personal liability beyond the declaratory and injunctive relief sought in his capacity as a judicial officer charged with implementing Section 349.

The State retained then-Attorney Bouchard to represent it in the *DelCOG* Litigation some time before November 29, 2011.[8] At that time, then-Attorney Bouchard sent a letter to the Court on behalf of all parties coordinating a briefing and oral argument schedule for the cross-motions for judgment on the pleadings. As the letter indicates, the parties agreed to stay discovery pending a ruling on those motions. Also copied on the letter were the Coalition's counsel and the counsel for the Judicial Officers, Professor Lawrence A. Hamermesh of the Widener University - Delaware Law School.

The United States District Court for the District of Delaware held oral argument on February 9, 2012.[9] Then-Attorney Bouchard and other attorneys at his firm continued to represent the State and the Court of Chancery. Professor Hamermesh continued to represent the Judicial Officers. During that argument, the parties confirmed a prior agreement that the State and the Court of Chancery should be dismissed.[10] Then-Attorney

---

[8] *Id.* at A036–37 (Letter from Counsel).

[9] *Id.* at A048 (*DelCOG* Oral Argument Transcript).

[10] *Id.* at A053.

Bouchard presented oral argument on behalf of all defendants, including Vice Chancellor Parsons.

The District Court granted judgment in the Coalition's favor on the cross-motions on August 30, 2012.[11] Consistent with the parties' stipulation, the District Court dismissed the State and Court of Chancery on Eleventh Amendment sovereign immunity grounds.[12] Then-Attorney Bouchard remained counsel of record in the case, and on October 12, 2012, he entered his appearance for the Judicial Officers, including Vice Chancellor Parsons.[13]

While that matter was on appeal, Vice Chancellor Parsons granted Roche summary judgment on the first of the two breach of contract counts in the Meso Litigation on February 22, 2013.[14] He presided over a trial on the remaining count three days later, from February 25 through March 1, 2013.[15]

The United States Court of Appeals for the Third Circuit affirmed the District Court in the *DelCOG* Litigation on October 23, 2013.[16] Then-Attorney Bouchard was still one of several attorneys representing the Judicial Officers at that time.[17]

---

[11] *Del. Coal. for Open Gov't, Inc. v. Strine*, 894 F. Supp. 2d 493, 504 (D. Del. 2012).

[12] *Id.* at 494 n.1.

[13] App. to Op. Br. at A135 (Entry of Appearance); *see also id.* at A141–94 (Petition for Writ of Certiorari) (application for United States Supreme Court review in the *DelCOG* litigation).

[14] *Meso Scale Diagnostics, LLC v. Roche Diagnostics GmbH*, 62 A.3d 62, 94 (Del. Ch. 2013).

[15] *Meso Scale Diagnostics, LLC v. Roche Diagnostics GmbH*, 2014 WL 2919333, at *12 (Del. Ch. June 25, 2014).

[16] *Del. Coal. for Open Gov't v. Strine*, 733 F.3d 510, 521 (3d Cir. 2013).

[17] *Id.* at 511.

Thereafter, Vice Chancellor Parsons heard post-trial argument in the Meso Litigation on November 8, 2013.[18]

On January 21, 2014, then-Attorney Bouchard, Professor Hamermesh, and the rest of the defense team in the *DelCOG* Litigation submitted a Petition for Writ of Certiorari to the United States Supreme Court.[19] The United States Supreme Court denied certiorari on March 24, 2014.[20] The parties allege no further involvement by then-Attorney Bouchard in the *DelCOG* Litigation.

On April 16, 2014, then-Attorney Bouchard sought to withdraw from representing Meso in anticipation of his elevation to the position of Chancellor of the Court of Chancery, while his firm continued the representation.[21] The trial court approved that request, and he withdrew on April 29, 2014.[22] On June 25, 2014, Vice Chancellor Parsons issued a decision in Roche's favor on the remaining breach of contract count.[23] This Court affirmed the judgment on the basis of the trial court's opinion on June 18, 2015.[24] The United States Supreme Court denied certiorari on November 16, 2015.[25]

The foregoing facts are undisputed.

---

[18] *Meso Scale Diagnostics*, 2014 WL 2919333, at *12.

[19] App. to Op. Br. at A141 (Petition for Writ of Certiorari).

[20] *Strine v. Delaware Coalition for Open Government, Inc.*, 572 U.S. 1029 (2014).

[21] App. to Ans. Br. at B48–49 (Motion to Withdraw Appearance).

[22] App. to Op. Br. at A20 (Complaint).

[23] *Meso Scale Diagnostics*, 2014 WL 2919333, at *29.

[24] 116 A.3d 1244, 2015 WL 3824809 (Del. June 18, 2015).

[25] 136 S. Ct. 524 (2015).

7

Meso asserts, and in this procedural posture we assume to be true, certain key subsequent developments:

> 15. In early 2018, Jacob Wohlstadter, the President and Chief Executive Officer of Meso, was conducting Internet research and discovered for the first time that Mr. Bouchard had represented Vice Chancellor Parsons in the DelCOG Litigation during his representation of Roche in the Meso Litigation.

> 16. Mr. Wohlstadter immediately notified Jonathan Klein-Evans, the Vice President and General Counsel of Meso, and Meso's Chief Legal Officer of this revelation, about which all were previously unaware. They were all shocked that Vice Chancellor Parsons had never disclosed this fact or recused himself from the Meso Litigation.

> 17. After Meso learned of this conflict of interest, and despite its involvement in another trial at the time, Mr. Klein-Evans led a careful investigation of the issue. The investigation confirmed that no one at Meso was aware of Mr. Bouchard's representation of Vice Chancellor Parsons. Nor were there any indications that it had been disclosed.[26]

Thereafter, Meso sought to retain counsel to collaterally challenge the judgment. Meso secured its current firm in July 2018 after six other firms declined to represent it. That firm lacked a Delaware office, and Meso was able to retain local counsel on January 24, 2019 only after five other firms declined representation. Meso sought to file the instant matter as a Rule 60(b) motion under the Meso Litigation's docket on February 22, 2019. At the direction of the clerk's office, Meso refashioned the motion as a separate complaint and filed it on February 28, 2019, stipulating that "the Court may elect to treat this complaint as a motion under subsections (4) and (6) of [Court of Chancery Rule 60(b)]."[27]

---

[26] App. to Op. Br. at A20–21 (Complaint).

[27] *Id*. at A17 (alteration added).

8

Roche moved to dismiss. The Court of Chancery heard argument on May 6, 2020.[28] On May 18, 2020, the trial court ruled that Meso was not entitled to relief under either Rule 60(b)(4) or 60(b)(6), and it granted Roche's dismissal motion.

## II. The Court of Chancery's Ruling

Meso argued that the court's judgment in the Meso Litigation was "void" under Rule 60(b)(4) because Vice Chancellor Parsons's failure to recuse himself violated Meso's due process rights. The Court of Chancery disagreed.

Surveying federal case law, the Court of Chancery determined that a due process violation renders a judgment void only when the violation involves "a failure to give notice, reasonably calculated to afford the parties an opportunity to be heard," or when the judgment is premised on a certain type of jurisdictional error.[29] According to the Vice Chancellor, failure to recuse results in a judgment that "was, at best [for Meso], voidable."[30] Because voidable judgments are not subject to vacatur under Rule 60(b)(4), the Vice Chancellor found that subsection inapplicable.

The Court of Chancery also rejected Meso's claim that it was entitled to relief under Rule 60(b)(6), which provides for relief from a final judgment for "any other reason justifying relief from the operation of the judgment."[31] The court relied on *Liljeberg v.*

---

[28] App. to Ans. Br. at B319–79 (Motion to Dismiss Oral Argument Transcript).

[29] *Order* at 11–12.

[30] *Id*. at 16. Because of this finding, the court determined that it did not need to resolve the question of whether the alleged failure to recuse would ever constitute a violation of due process.

[31] Del. Ct. Ch. R. 60(b)(6).

9

*Health Services Acquisition Corp.*[32] as the key case for analyzing undisclosed conflicts of interest under Rule 60(b)(6). The trial court reasoned, based on *Liljeberg*, that in order to obtain vacatur, Meso had to show that (1) it acted within a reasonable time, and (2) the failure to recuse constituted "extraordinary circumstances," considering three factors set forth in *Liljeberg*. As the United States Supreme Court explained in *Liljeberg*:

> Rule 60(b)(6) relief is accordingly neither categorically available nor categorically unavailable for all [judicial disqualification] violations. We conclude that in determining whether a judgment should be vacated for a violation of [the federal judicial disqualification statute], it is appropriate to consider the risk of injustice to the parties in the particular case, the risk that the denial of relief will produce injustice in other cases, and the risk of undermining the public's confidence in the judicial process. We must continuously bear in mind that "to perform its high function in the best way 'justice must satisfy the appearance of justice.'"[33]

Applying that standard, the Court of Chancery determined that Meso had neither acted within a reasonable time nor had it identified extraordinary circumstances.

As to the first step of the test, the court found that "conspicuously absent from Meso's pleading is an averment that its attorneys did not know of now-Chancellor Bouchard's representation."[34] Although when pressed at oral argument Meso asserted that it had reached out to its former counsel's firms to investigate their awareness of the representation issue, the trial court refused to consider facts not pled. Because Meso's attorney's knowledge was imputable to it, the Vice Chancellor found that Meso's lack of

---

[32] 486 U.S. 847, 108 S. Ct. 2194, 100 L. Ed. 2d 855 (1988) (citing 28 U.S.C. § 455, the statute for federal judicial disqualification).

[33] *Id.* at 864 (quoting *In re Murchison*, 349 U.S. 133, 136 (1955)).

[34] *Order* at 17.

awareness of the highly-publicized *DelCOG* Litigation could not be inferred reasonably from the averments in the complaint.

The trial court then found that even if Meso had pled that neither it nor its attorneys knew of the *DelCOG* Litigation and representation at any time prior to early 2018, the full year delay in securing counsel was unreasonable. The court also took judicial notice that, while "not ultimately dispositive," Meso's eventual local counsel was the Coalition's counsel from the *DelCOG* Litigation.[35]

As to extraordinary circumstances, the trial court found that granting relief would severely prejudice Roche by negating a long-settled judgment obtained after trial, while Meso had failed to allege any injustice that it would suffer. Likewise, the trial court found that "the ostensible judicial ethics violation Meso has identified is not remotely, much less conceivably, serious under the Rule 60(b) rubric."[36] The trial court noted that the lawsuit named all of the Judicial Officers; that its allegations were directed to them solely in their official capacity; and that it "merely sought to prevent confidential arbitrations, a process from which the judges would reap no personal benefit."[37] Given those facts, the trial court concluded that even if the representation were deemed to violate judicial ethics rules, it could not have "caused any reasonably conceivable harm, much less serious harm."[38]

---

[35] *Id.* at 19.

[36] *Id.* at 22.

[37] *Id.*

[38] *Id.* at 23.

### III.    Contentions on Appeal

On appeal, Meso argues that the Court of Chancery erred in denying relief under both Rule 60(b)(4) and Rule 60(b)(6).

Meso argues that Rule 60(b)(4) applies because any judgment issued in violation of "procedural due process" is void.  It also argues that even if only a narrower subset of due process violations satisfy Rule 60(b)(4), the judgment is void in this case because a hearing before a conflicted judicial officer deprived Meso of the "opportunity to be heard." Therefore, Meso urges us to examine the constitutional due process issue and hold that Vice Chancellor Parsons violated Meso's due process rights by failing to recuse.

As to Rule 60(b)(6), Meso asserts that it was not aware of the *DelCOG* Litigation and potential conflict until Mr. Wohlstadter's internet search in 2018.  Acknowledging that attorney knowledge is imputed to the client, Meso argues that it nevertheless properly pled a lack of awareness of the conflict at the time of the trial and appeal.  It urges the Court to consider the year-long gap between Mr. Wohlstadter's search and its filing justified in light of the difficulty it experienced in retaining a firm willing to represent it in a suit alleging "serious ethics violations" by a Vice Chancellor.

Roche believes that both of Meso's arguments are misguided.  It argues that we and many other jurisdictions have found that recusal violations render a judgment merely voidable, not void, and hence ineligible for vacatur under Rule 60(b)(4).  It argues that Meso's efforts to distinguish these authorities by claiming that the threat of impartiality

12

constructively denied them an opportunity to be heard cannot survive its concession that the Vice Chancellor was not in fact actually biased.

Roche further contends that the trial court's Rule 60(b)(6) ruling is correct. It asserts that the judicial ethics rules did not require recusal since Vice Chancellor Parsons was clearly a nominal party in the *DelCOG* Litigation and that no objective observer would harbor doubts as to his impartiality. In any case, because *all* members of the Court of Chancery had the same potential conflict as the nominal defendants in the *DelCOG* Litigation, Roche argues that the rule of necessity would militate against recusal even if it were otherwise warranted.

## IV.    *The Relevant Ethical Framework*

We first explain the ethical framework in which Meso's Rule 60(b) challenge arises, as the parties have devoted much attention to the ethical rules pertaining to judicial conflicts. Although Rule 60(b) is the basis upon which this dispute is resolved, the underlying ethical framework is important to our system of justice and in promoting public confidence in the integrity of our judicial system. We start with the basic rules governing judicial disqualification and recusal and then consider other ethical considerations relevant to the unique circumstances presented here. We then address the Rule 60(b) issues Meso has raised on appeal.

### A. *The Delaware Judicial Code*

This Court is the entity ultimately responsible for promulgating the rules and

13

practices governing both bench and bar in Delaware.[39]  We promulgated the Delaware

Judges' Code of Judicial Conduct ("Judicial Code") in fulfillment of that duty.[40]

The Judicial Code provides that a "judge should uphold the integrity, independence

and impartiality of the judiciary"[41] and to that end "should avoid impropriety and the

appearance of impropriety in all activities."[42]  According to the Judicial Code,

"impartiality" is the "absence of bias or prejudice in favor of, or against, particular parties

or classes of parties, as well as maintenance of an open mind in considering issues that may

---

[39] *See* Del. Const. art. IV, § 37 ("A judicial officer may be censured or removed by virtue of this section for. . . persistent misconduct in violation of the Canons of Judicial Ethics as adopted by the Delaware Supreme Court from time to time."); *see In re Appeal of Infotechnology, Inc.*, 582 A.2d 215, 216–17 (Del. 1990) ("Unless the challenged conduct prejudices the fairness of the proceedings, such that it adversely affects the fair and efficient administration of justice, only this Court has the power and responsibility to govern the Bar, and in pursuance of that authority to enforce the Rules for disciplinary purposes."); *see also In re Green*, 464 A.2d 881, 885 (Del. 1983) (internal citations omitted):

> This Court, alone, has the responsibility for licensing and disciplining persons admitted to practice in Delaware.  This tenet is of historic proportions, having been transplanted to Delaware by the colonists.  It is based on the concept, taken from England, that the courts possess the exclusive right to govern the practice of law.
>
> Moreover, the interest of this State in matters pertaining to the admission and regulation of lawyers practicing before our courts is essential to the primary governmental function of administering justice, and in meeting our obligation to protect the public by assuring and maintaining high standards of conduct of persons admitted to this Bar.

[40] *See* Del. Judges' Code of Judicial Conduct [Hereinafter "Judicial Code"] Preamble ("This Code shall constitute the 'Canons of Judicial Ethics' referenced in the Delaware Constitution, Article IV, Section 37.").

[41] *Id.* Canon 1.  *See also id.* Canon 2 ("A judge should perform the duties of judicial office impartially, competently and diligently.").

[42] *Id*. R. 1.2(A).  *See also id.* R. 2.3(B) ("A judge should avoid impropriety and the appearance of impropriety in all activities."); R. 2.5(A) ("A judge should perform the duties of the office impartially and diligently.").

14

come before a judge."[43]  The Judicial Code provides that "[t]he test for appearance of improbity is whether the conduct would create in reasonable minds, with knowledge of all the relevant circumstances that a reasonable inquiry would disclose, a perception that the judge's ability to carry out judicial responsibilities with integrity, impartiality and competence is impaired."[44]

Judicial Code Rule 2.11 governs disqualification.  That Rule states that "[a] judge should disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to" a set of enumerated examples.[45] Those examples, contained in Rule 2.11(A), include situations where the judge is biased; has personal knowledge of disputed evidentiary facts concerning the proceeding; where the judge, the judge's relative to within the third degree or the judge's spouse or domestic partner has or is likely to have some involvement in the case at bar; where some member of the judge's household, directly or as a fiduciary, has an economic interest in the subject matter, or in a party, or any other interest that could be substantially affected by the outcome of the proceeding; or where the judge "served as a lawyer in the matter in

---

[43] *Id.* Terminology.  *See also* ABA Model Code of Judicial Conduct, Terminology (defining "impartiality" as the "absence of bias or prejudice in favor of, or against, particular parties or classes of parties, as well as maintenance of an open mind in considering issues that may come before a judge").

[44] Judicial Code R. 1.2(A) cmt.

[45] *See also Stevenson v. State*, 782 A.2d 249, 255 (Del. 2001) (regarding the predecessor provision to Rule 2.11, this Court observed that "[t]he specific instances prompting disqualification that are set forth in the Code do not exhaust all situations in which a judge's impartiality may be reasonably questioned.").

15

controversy, or a lawyer with whom the judge previously practiced law served during such association as a lawyer concerning the matter, or the judge or such lawyer has been a material witness concerning it, or the judge was associated in the practice of law within the preceding year with a law firm or lawyer acting as counsel in the proceeding."[46]

In furtherance of these requirements, Rule 2.11(B) obligates the judge to make reasonable efforts to keep informed of his or her own economic and fiduciary interests, and those of the judge's immediate family and household members.[47]

With certain enumerated exceptions listed in the rule, Rule 2.11(C) provides that as an alternative to disqualification, the judge "may, instead of withdrawing from the proceeding, disclose on the record the basis of the judge's disqualification," and "if the parties and their lawyers, after such disclosure and an opportunity to confer outside of the presence of the judge, all agree in writing or on the record that the judge should not be disqualified, and the judge is then willing to participate, the judge may participate in the proceeding."[48]

Disclosure and waiver pursuant to Rule 2.11(C) is available for all situations in which a judge is disqualified by the terms of Rule 2.11, *except* two from the enumerated list, namely, Rule 2.11(A)(1) and 2.11(A)(4).[49] Those are, respectively, conflicts due to

---

[46] Judicial Code R. 2.11(A)(4)(a).

[47] *Id*. R. 2.11(B).

[48] Judicial Code R. 2.11(C).

[49] *Id.*

actual personal bias or prejudice concerning a party or personal knowledge of disputed evidentiary facts concerning the proceeding, and certain enumerated matters related to the judge's or the judge's previous law practice's current or prior involvement in the case.[50]

### B. Conflicts Arising from the Judge as Party in Other Litigation

The cases addressing judicial disqualification and recusal invariably involve an analysis of the unique facts and circumstances giving rise to the challenge. The leading Delaware case on judicial disqualification arising from the judge's participation as a party in other litigation is *Los v. Los*.[51]

*Los* involved parties in acrimonious and lengthy Family Court litigation. Mr. Los petitioned for review of a child support order. Two weeks before the hearing, he filed suit in federal court against Ms. Los, her counsel, the Delaware Attorney General, and the Family Court judge, seeking to invalidate as unconstitutional Delaware's child support formula and Family Court Rule 26, requiring court approval before initiating discovery.[52] Though it recited a prayer for damages, the federal suit's claims against the Family Court

---

[50] In other words, if the lawyer's participation in the matter before the judge gives rise to an actual bias or prejudice, the judge is disqualified under Rule 2.11(A)(1), and the disqualification is not waivable. Assuming the judge "reasonably concludes" that he or she does not have an actual bias or prejudice, the judge "may continue to preside over the matter as long as [the judge] complies with the remaining requirements" of Rule 2.11(C)." *Lawyer Concurrently Representing Judge and Litigant Before the Judge in Unrelated Matters*, ABA Standing Comm. On Ethics & Prof'l Resp., Formal Op. 07-449 (Aug. 9, 2007).

[51] 595 A.2d 381 (Del. 1991).

[52] *Id.* at 383.

judge were solely that he discharged his official duties in accordance with court rules and state law.

At the hearing, Mr. Los sought the judge's recusal. He asserted that the federal case rendered the judge conflicted, and also that the judge was biased against him, but presented no specific basis for his claim. The Family Court judge determined first that he harbored no subjective bias against Mr. Los, and second that the federal litigation did not present a disabling conflict, and so he refused to disqualify himself. As Mr. Los refused to participate in the hearing, the judge dismissed the petition and Mr. Los appealed.

This Court affirmed the Family Court's decision. In our view, "as a matter of due process, a litigant is entitled to neutrality on the part of the presiding judge but the standards governing disqualification also require the appearance of impartiality."[53] We noted that the judicial ethics rules we had promulgated codified both of these requirements.[54]

We determined that "[w]here the basis for the alleged disqualification is a claim, under Canon 3(C)(1) [the predecessor to Rule 2.11(A)], that the judge 'has a personal bias or prejudice concerning a party,' no *per se* automatic disqualification is required."[55]

---

[53] *Id.*

[54] At the time of *Los*, the operative ethical rule was Canon 3(C)(1) of the 1987 predecessor to the current Judicial Code. *Id.* (citing *Weber v. State*, 547 A.2d 948, 951–52 (Del. 1988)). Canon 3(C)(1) corresponds to Rule 2.11(A)(1) of the current Delaware Judicial Code. The modest differences between Canon 3(C)(1) in the 1987 Judicial Code and Rule 2.11(A) in the current one, including use of masculine language to refer to the judge in the 1987 version, are immaterial to the present case. As we note in the Preamble, we adopted the current Judicial Code in 2008, reformatting and renumbering its provisions to conform to the order and numbering of the ABA 2007 Model Code of Judicial Conduct.

[55] *Los*, 595 A.2d at 384.

Instead, we held that when "faced with a claim of personal bias or prejudice" under Canon 3(C)(1), the judge must engage in a two-part analysis to determine if recusal is warranted. First, the judge must determine whether she is subjectively satisfied that she can hear the case free of bias or prejudice concerning the party seeking recusal. Second, "even if the judge believes that he or she is free of bias or prejudice, the judge must objectively examine whether the circumstances require recusal because 'there is an appearance of bias sufficient to cause doubt as to the judge's impartiality.'"[56] When the trial judge performs those two inquiries, we review each under the deferential abuse of discretion standard.

As this Court further explained, "[t]he mere fact that a judge is an adverse party in another proceeding will not, by itself, result in automatic disqualification."[57] We noted a "compelling" policy reason for a judge not to disqualify herself at the behest of a party who initiates litigation against a judge -- in "the absence of genuine bias, a litigant should not be permitted to 'judge-shop' through the disqualification process."[58] Permitting a litigant

---

[56] *Stevenson v. State*, 782 A.2d at 255 (citation omitted); *see also Layton v. Layton*, 211 A.3d 136, 2019 WL 2078346, at *2 (Del. May 10, 2019) (TABLE) ("the judge must determine whether there is the appearance of bias sufficient to cause objective doubt as to the judge's impartiality"); *Turner v. State*, 162 A.3d 102, 2017 WL 1954944, at *1 (Del. May 10, 2017) (TABLE) ("even if the judge subjectively believes she does not have bias, she must determine that there is not an 'appearance of bias sufficient to cause doubt as to the judge's impartiality.'") (quoting *Los*, 595 A.2d at 385). As the United States Supreme Court stated in *In re Murchison*, "to perform its high function in the best way, 'justice must satisfy the appearance of justice.'" 349 U.S. at 136 (quoting *Offutt v. United States*, 348 U.S. 11, 14 (1954)).

[57] *Los*, 595 A.2d at 385.

[58] *Id*.

19

to exert control over which judge presides over a case by provoking a conflict by filing another action would hamper the orderly administration of justice.[59]

That policy concern, so compelling in *Los*, is inapplicable here. Though we stated in *Los* that "there was no requirement that [a judge] disqualify himself where he was sued in his judicial capacity in an action instituted during the course of the proceedings before him," we were addressing a circumstance where the litigant seeking disqualification provoked the conflict. Meso did not. Though the *DelCOG* Litigation was later-filed, the alleged conflict arose because of the involvement of *Roche's* counsel. Meso and its agents neither created nor controlled the circumstances of which it now complains. That dissimilarity distinguishes *Los* from the present case and necessitates further examination.

### C. Other Jurisdictions' Treatment of Judge-as-Litigant Conflicts

Because this Court has not previously examined cases where counsel represented a judge in a different case, we examine the treatment of this issue in other jurisdictions. Our Delaware Judicial Code is derived in substantial part from the American Bar Association's ("ABA") Model Code of Judicial Conduct. Many other states have similarly modeled their own rules of judicial ethics on the ABA Model Code and have considered the effect of an attorney's representation of the judge in an unrelated suit.[60]

---

[59] *Id*. (citing *Smith v. Smith*, 564 P.2d 1266 (Ariz. 1977)).

[60] Delaware courts have examined this issue in cases involving other types of adjudicators. Although the standards applied in these situations are not the same as those applied in the judicial context, they offer some insight into the concerns posed by such dual representations. In *Beebe Med. Ctr., Inc. v. InSight Health Servs. Corp.*, a party sought vacatur of an arbitration award after learning that adverse counsel represented the arbitrator (who sat as one member of a three-lawyer arbitration panel) in an unrelated suit for money damages against the arbitrator's former employer.

Considering the dual representation issue, the ABA's Standing Committee on Ethics and Professional Responsibility ("ABA Committee") issued Informal Opinion 1477[61] in 1981, primarily directed to the judge's obligations, and Formal Ethics Opinion 07-449[62] in 2007, addressing both the attorney's and judge's obligations.

In its earlier Informal Opinion 1477, the ABA Committee stated that in the absence of applicability of the rule of necessity, "when a private lawyer is currently representing a judge, even in a matter involving the judge's official position or conduct, the judge should not sit in a case in which a litigant is represented by the lawyer or by the lawyer's partner

---

751 A.2d 426, 427 (Del. Ch. 1999). The Court of Chancery determined that the "evident partiality" standard under 10 *Del. C.* § 5714(a)(2) was satisfied and vacatur was the necessary remedy "where an arbitrator does not disclose a relationship with a party that creates a reasonable impression of bias." *Beebe*, 751 A.2d at 427. *See also Del. Transit Corp. v. Amalgamated Transit Union Local 842*, 34 A.3d 1064, 1072 (Del. 2011) (holding that to demonstrate "evident partiality," the record "must reflect that an arbitrator failed to disclose a substantial personal or financial relationship with a party, a party's agent, or a party's attorney that a reasonable person would conclude was powerfully suggestive of bias."). In *Home Paramount Pest Control v. Gibbs*, 953 A.2d 219 (Del. 2008), an employer sought to vacate an administrative decision awarding workers' compensation benefits to an employee for carpal tunnel syndrome. The employer's basis for vacatur was a constellation of similarities between the employee's claim and an earlier claim that the hearing officer herself had filed. We determined that the two-part *Los* test applied to an Industrial Accident Board hearing officer. *Id.* at 221. Applying it, this Court found no abuse of discretion in the hearing officer's determination that she was not subjectively biased. But we concluded that "a person knowing this unusual overlap in both the claim and the participants" in the hearing officer's past case and the case before her "would have a reasonable basis to question her impartiality." *Id.* at 222. Thus, we held that "in order to promote public trust and confidence in our judicial system, the hearing officer should have recused herself," and we reversed. *Id.*

[61] *Requirement of Judicial Recusal When a Litigant is Represented by Judge's Lawyers*, ABA Standing Comm. on Ethics & Prof. Resp., Informal Op. 1477 (Aug. 12, 1981) [Hereinafter "Opinion 1477"]. Like *Los*, Opinion 1477 was decided under the prior numbering system, wherein Rule 2.11(A)'s provisions were embodied by Canon 3(C)(1).

[62] *Lawyer Concurrently Representing Judge and Litigant Before the Judge in Unrelated Matters*, ABA Standing Comm. On Ethics & Prof'l Resp., Formal Op. 07-449 (Aug. 9, 2007) [Hereinafter "Opinion 07-449"].

or associate."[63]    Thus, the ABA Committee drew no distinction between lawyers "representing the judge in a personal matter or in a matter pertaining to the judge's official position or conduct."[64]

In its 2007 Formal Opinion 07-499, the ABA Committee later stated that:

> The Committee does not assume that, whenever a judge finds herself presiding over a matter in which a lawyer for one of the parties is concurrently representing her in an unrelated matter, she inevitably develops a personal bias or prejudice for or against her lawyer thus triggering the mandatory and nonwaivable disqualification under Judicial Code Rule 2.11(A)(1).  The existence or nonexistence of such bias or prejudice depends on the facts of any particular situation.  When a judge reasonably concludes that she is not personally biased or prejudiced towards her lawyer, she may continue to preside over the matter as long as she complies with the remaining requirements of Judicial Code Rule 2.11(C).[65]

Thus, in the ABA Committee's view, such a conflict can be waived when a judge reasonably concludes that she is not personally biased or prejudiced towards her lawyer.[66]

---

[63] Opinion 1477 at 2.  In Opinion 1477, the ABA expressly did not address a situation in which a judge, in her official capacity, is represented by "a state attorney general in discharge of the attorney general's legal duty to represent judicial officers in matters pertaining to their judicial office or duty."  *Id*.  It expressly stated that it did not reach "the view that such a situation would require recusal in all cases in which the attorney general, or other public attorney, or their assistants represent the state or its agencies before the court."  *Id*.

[64] Opinion 1477 at 1.

[65] Opinion 07-449 at 2.

[66] *See* Opinion 07-449 at 1.  ("[A]bsent such a bias or prejudice for or against her lawyer, under Judicial Code Rule 2.11(C), the judge may continue to participate in the proceeding if the judge discloses on the record that she is being represented in the other matter by one of the lawyers, and the parties and their lawyers all consider such disclosure, out of the presence of the judge and court personnel, and unanimously agree to waive the judge's disqualification."); Opinion 1477 at 2 (noting that the ABA's Model Code "permits remittal of disqualification in specified circumstances (financial interest and family relationship) upon agreement of their parties and their lawyers that the judge's interest is insubstantial or his relationship is immaterial.").

Waiver under Rule 2.11(C) requires that a willing judge disclose the representation on the record, and then:

> ask the parties and their lawyers to consider, outside the presence of the judge and court personnel, whether to waive disqualification. If, following the disclosure, the parties and lawyers agree, without participation by the judge or court personnel, that the judge should not be disqualified, the judge may participate in the proceeding. The agreement shall be incorporated into the record of the proceeding.[67]

The ABA Committee regards the judge's ethical obligation to disclose the representation issue as unequivocal, and states that the absence of such disclosure "cannot be cured by reliance on the fact that all parties to the matter already might be aware of the lawyer's representation of the judge in another matter."[68]

Various state supreme courts have addressed this dual representation issue. The Supreme Court of Iowa also construes its version of Rule 2.11(A) as being the relevant inquiry in cases where a judge is represented by a party's counsel.[69] In *In re Howes*, an Iowa judge was represented by an attorney in the judge's divorce.[70] While that representation was ongoing, the attorney sought an *ex parte* temporary injunction on behalf of another client in a custody matter from the judge, who granted it.[71] The Iowa Supreme

---

[67] ABA Model Code of Judicial Conduct R. 2.11(C). Opinion 07-449 cites Rule 2.11(C) by name as the appropriate procedure, while Opinion 1477 cites its predecessor extant at the time, Canon 3(D).

[68] Opinion 07-449 at 3.

[69] *In re Howes*, 880 N.W.2d 184, 193 (Iowa 2016).

[70] *Id*. at 189.

[71] *Id*. at 190–91.

Court stated that its version of Rule 2.11 "does not presume actual personal bias or prejudice on the part of a judge merely because a party's lawyer currently represents or previously represented the judge in an unrelated matter." Rather, "disqualification is required based on an existing or former attorney-client relationship between the judge and a party's lawyer only when 'the judge's impartiality might reasonably be questioned' due to that relationship."[72] The Court then found that "[w]hen an attorney who contemporaneously represents or recently represented a judge in a personal matter appears before the judge in another case and the judge does not disclose that fact to the parties, the judge's impartiality might reasonably be questioned."[73] Because the judge did not disclose the representation to the parties and obtain a waiver, she was required to disqualify herself from the injunction proceeding.[74]

The Supreme Court of North Dakota dealt with the issue of a judge's representation by a party's law firm in *Sargent County Bank v. Wentworth*.[75] In that case, a disbarred attorney, William Williams, had commenced a "frivolous" "nuisance lawsuit" against a judge, the state attorney general, the state bar association, the attorney disciplinary authority, and others. The lawyer who represented the judge in that suit was part of a firm, another member of which represented a bank in a foreclosure proceeding before the judge.

---

[72] 880 N.W.2d at 194–95 (citing Iowa R. 51:2.11).

[73] *Id.* at 195.

[74] *Id.* at 204.

[75] 500 N.W.2d 862 (N.D. 1993).

The bank's firm had represented the judge in the Williams suit; the bank's original attorney had been one of the judge's co-defendants; and that same attorney was a fact witness in the foreclosure action. The court held that "a reasonable person could, on the basis of these objective facts, reasonably question [the judge's] impartiality," and that the judge therefore was required to disqualify himself in the foreclosure action.[76]

The Ohio Supreme Court, in *In re Disqualification of Reinbold*, stated that "[a] trial judge's impartiality may reasonably be questioned if he or she presides over a case in which a litigant is represented by the judge's own lawyer" and that the Ohio "chief justice and the Board of Professional Conduct have long advised that a judge should recuse himself or herself—or be disqualified—from actions in which an attorney in the case is representing the judge in another proceeding."[77]

*Wright & Miller* also observes a similar rule under the applicable federal statute, which requires judicial disqualification "in any proceeding in which [a judge's] impartiality might reasonably be questioned."[78] That treatise states that a situation in which "an attorney in the case is currently representing the judge in a suit for damages . . . seems appropriate for disqualification under § 455(a)."[79]

---

[76] *Id.* at 879–80. The North Dakota Supreme Court reversed the judgment in favor of the bank and remanded for a new trial before a different judge. *Id*. at 880.

[77] 94 N.E.3d 570, 570 (Ohio 2017).

[78] 28 U.S.C. § 455(a).

[79] 13D Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 3549, at text accompanying note 28 (3d ed. Oct. 2020 update) (citing cases).

But the existence of bias or prejudice depends on the unique facts in each case. In their briefing, the parties recognize this and address a number of factors such as whether the judicial officer has been sued in her official capacity, whether the judicial officer is a nominal party, and whether all judicial officers who might normally preside over the matter have also been sued.[80] Because the litigation was brought against Vice Chancellor Parsons in his official capacity and as a nominal party, and against all of the other members of the Court of Chancery, and because the Vice Chancellor had no financial or other personal interest in the outcome of that lawsuit, we next consider how certain jurisdictions have weighed these factors.

### D. Representation in an Official Capacity Suit

In analyzing disqualification when counsel appearing before a judge represents that judge in another matter, various courts have distinguished between suits where the judge is sued in her personal capacity versus suits asserting claims arising from her official conduct and position.

The Iowa Supreme Court limited its decision *In re Howes* (discussed above) to cases where judges were represented in "personal matters." That court expressly noted that it "need not decide whether or under what circumstances disqualification is required under

---

[80] For example, Meso acknowledges in its opening brief that there are "a host of other factors that could distinguish this case from others" including the level of counsel's "involvement" in the underlying litigation. Op. Br. at 17.

rule [2.11(A)] based on an attorney's representation of a judge in a matter concerning the judge's official acts."[81]

Conversely, in *In re Disqualification of Badger*, the Ohio Supreme Court required disqualification where nothing suggested that the judge was biased or prejudiced, where the unrelated case in which the judge was concurrently represented by counsel pertained to the judge's official position, and where the judge had no involvement in the selection of counsel.[82] The Ohio Supreme Court later observed that this rule had been modified as it applies to prosecuting attorneys and the Attorney General, who are statutorily required to represent judges in their official capacity, and to judges who are named as nominal parties and who are represented by the Attorney General's office. Thus, in *In re Disqualification of Whitmore*, the Ohio Supreme Court held that disqualification was not required where the prosecuting attorney representing the judge was not the same prosecutor appearing before the judge in another case.[83] More recently the Ohio Supreme Court noted a number of "recognized exceptions" to the rule that "[a] trial judge's impartiality may reasonably be questioned if he or she presides over a case in which a litigant is represented by the judge's own lawyer."[84] Included among the exceptions is that "disqualification may not be necessary if the judge is merely a nominal party in the case represented by the

---

[81] *See In re Howes*, 800 N.W.2d at 195 n.3 (alteration added).

[82] 546 N.E.2d 929, 929 (Ohio 1989) ("when a private lawyer is currently representing a judge, even in a matter involving the judge's official position or conduct, the judge should not sit in a case in which a litigant is represented by the lawyer.") (quoting and following Opinion 1477).

[83] 704 N.E.2d 1235, 1235 (Ohio 1998).

[84] *In re Disqualification of Reinbold*, 94 N.E.3d at 570.

prosecuting attorney or attorney general or if the judge is not personally or substantively involved in that litigation."[85]

The United States Judicial Conference Committee on Codes of Conduct has opined that disqualification is not always required when the unrelated suit is against the judge in his or her official capacity.[86] In the Committee's view, "a judge's impartiality cannot reasonably be questioned in unrelated matters handled by the DOJ simply because the Department provides representation in a lawsuit naming the judge in an official capacity,"[87] and "[w]hen accepting representation by the Department, a judge is not choosing a personal attorney, and the DOJ is not the same as a private law firm."[88] More broadly, the Committee stated, "[n]or is disqualification always required in unrelated matters handled by the individual attorney assigned to represent the judge."[89] As it explained, "[n]umerous lawsuits against judges are filed by disgruntled litigants and are patently frivolous; they are often dismissed promptly and without any discovery on the basis of the judge's absolute judicial immunity," and "[i]n these instances, a judge often will have little personal contact with the government attorney providing representation."[90] Thus, disqualification "is not

---

[85] *Id.* at at 571.

[86] U.S. Jud. Conf. Comm. Code Cond., *Disqualification Issues Relating to Judge Being Sued in Official Capacity, Including Representation by Department of Justice*, Adv. Op. No. 102, 2009 WL 8484596 (June 2009).

[87] *Id*. at *1.

[88] *Id*.

[89] *Id*.

[90] *Id*.

always required, but instead depends on the particular facts and circumstances of the case," including the nature of the claims and the judge's relationship with the attorney.[91]

The Kentucky Supreme Court, in *Alred v. Kentucky Judicial Conduct Commission*, relying on a Kentucky Judicial Ethics Opinion, has recognized that "where a judge is sued in his official capacity and the Attorney General's office represents him, the judge need not automatically disqualify himself from cases in which the Attorney General participates."[92] That court has held that the same rule applies where "a judge is sued in his official capacity . . . and he hires outside counsel to represent him," but has distinguished that situation from a situation in which the judge "hires an outside attorney to represent him in personal litigation."[93]

As these cases illustrate, the capacity in which a judicial officer is sued is an important factor to consider. On one end of that continuum is a lawyer representing a judge in highly personal litigation such as a divorce or personal injury case (as in *In re Howes*). On the other end might be, for example, a situation where a member of the Department of Justice ("DOJ"), pursuant to state statute,[94] represents a judicial officer sued in her official capacity. Even when judges are sued in their official capacity, there are often other nuances

---

[91] *Id.* at *1–2.

[92] 395 S.W. 3d 417, 431–32 (Ky. 2012).

[93] *Id.* at 431.

[94] *See* 29 *Del. C.* § 2504(3) ("The State Department of Justice and the Attorney General shall have the following powers, duties and authority. . . [n]otwithstanding any other laws, to represent as counsel in all proceedings or actions which may be brought on behalf of or against them in their official capacity in any court, except in actions in which the State has a conflicting interest, all officers, agencies, departments, boards, commissions and instrumentalities of state government").

that affect the analysis, as the *Alred* case illustrates. Such other factors may include whether the judge is a mere nominal party, and whether and the extent to which the judge has direct contact with the DOJ attorneys.

In this case, the *DelCOG* Litigation asserted a cause of action under 42 U.S.C. § 1983.[95] The record overwhelmingly shows that Vice Chancellor Parsons was named as a defendant in his official capacity as a Vice Chancellor of the Court of Chancery and was merely a nominal party in the *DelCOG* Litigation.[96] He had no financial, reputational, or other personal stake in the suit at any time.[97]

### E. *The Rule of Necessity*

Other rules may come into play when all of the members of a court are named as defendants in a lawsuit. The "rule of necessity" is the principle of common law that "a judge is not disqualified to [sit in] a case because of his personal interest in the matter at

---

[95] App. to Op. Br. at A033 (*DelCOG* Complaint). Under Section 1983, "[a]n action for money damages may not be maintained against a state or its agencies." *Delaware Dept. of Health & Soc. Servs. v. Sheppard*, 864 A.2d 929, 2004 WL 2850086, at *2 (Del. Dec. 10, 2004) (TABLE) (citing *Lapides v. Bd. of Regents*, 535 U.S. 613, 617, 122 S. Ct. 1640, 152 L. Ed. 2d 806 (2002)).

[96] As the Court of Chancery observed, "[i]n the federal action, Vice Chancellor Parsons and the other members of the Court of Chancery were named as defendants because the coalition could not sue the State of Delaware or the Court of Chancery directly since they were protected from suit by sovereign immunity." *Order* at 5–6.

[97] Further, judges are absolutely immune from money damages resulting from their judicial actions. *Stump v. Sparkman*, 435 U.S. 349, 356, 98 S. Ct. 1099, 1104, 55 L. Ed. 2d 331 (1978). Judicial immunity is overcome only if the action complained of was taken outside "the judge's judicial capacity," or if the action was "taken in the complete absence of all jurisdiction." *Mireles v. Waco*, 502 U.S. 9, 11–12, 112 S. Ct. 286, 288, 116 L. Ed. 2d 9 (1991).

issue if there is no other judge available to hear and decide the case."[98]  This rule "reflects

the longstanding principle that to deny an individual access to courts for the vindication of

his or her rights constitutes a far more egregious wrong than to permit a judge to hear a

matter in which he or she has some interest."[99]  The rule has been applied to allow judges

to decide cases that would affect judicial retirement benefits or compensation for all of the

judges in a jurisdiction,[100] resolve a challenge to a rule requiring all federal judges to file

annual personal financial statements,[101] or decide the validity of a statute that would

compromise the independence of the state judiciary.[102]  It has been applied where the case

---

[98] *Atkins v. United States*, 556 F.2d 1028, 1036 (Ct. Cl. 1977) (alteration added).  The court in *Atkins* observed that, "[t]he rule of necessity was a part of the English common law and has been traced back to 1430 and the Year Books."  *Id* .

[99] *In re Howes*, 880 N.W.2d at 201 (citing *Weinstock v. Holden*, 995 S.W.2d 408, 410 (Mo. 1999)). Under the rule of necessity, our own procedures provide that "[r]ather than deny a party access to court, judicial disqualification yields to the demands of necessity."  Supr. Ct. Internal Op. Proc. XIX(2).  *See also id*. ("The rule of necessity has been invoked where disqualifications exist as to all members of the state judiciary who would normally hear a matter.").

[100] *See Fields v. Elected Officials' Ret. Plan*, 320 P.3d 1160, 1164 (Ariz. 2014) (invoking the rule of necessity where the Justices were all members of the plan at issue); *Bd. of Trs. of Pub. Emps.' Ret. Fund v. Hill*, 472 N.E.2d 204, 206 (Ind. 1985) (applying the rule of necessity in a case involving calculation of judicial retirement benefits); *Weinstock*, 995 S.W.2d at 410 (stating that "[w]hile this particular case involves judicial review of a 'concurrent resolution' relating to judicial pay rather than a statute, no doubt exists that all judges of the state, whether active or senior, have a potential stake in the outcome of the case," and "[u]nless the rule of necessity is applied, the parties can have no judicial resolution of their rights").

[101] *See Duplantier v. United States*, 606 F.2d 654, 662 (5th Cir. 1979) (holding that rule of necessity applied where all federal judges would have an interest in a case challenging a statute that required federal judges to file annual personal financial statements.).

[102] *See In re P.L. 2001, Chapter 362*, 895 A.2d 1128, 1131, 1143 (N.J. 2006) (invoking rule of necessity in a case challenging a statute that would "fatally compromise[] the independence of the judiciary" by creating in the administrative office of the courts "a law enforcement unit comprised of no less than two hundred probation officers" and directing the New Jersey Supreme Court to promulgate rules for the new unit).

involves a legal issue that was within the special province of the members of the allegedly disqualified court to decide,[103] or where an issue of disqualification involved all of the members of an appellate court, which made designation more problematic.[104]  Similarly, courts frequently hold that the rule of necessity allows judges to hear a case involving an "indiscriminate[]" litigant who has filed an action that names all of the judges in a particular jurisdiction as defendants.[105]  Application of the rule in such instances responds to those who filed litigation as a tactical effort to "manipulate the random assignment of judges."[106]

The rule of necessity exists in Delaware and requires conflicted judges to hear cases if there is no other judge able to do so.  As we said in *Nellius v. Stiftel*:

> The members of this Court would prefer not to sit in this appeal.  But this Court must recognize its responsibility to keep the doors of the Court open to every litigant.  The law is clear.  When the right of a litigant to be heard conflicts with the policy against decisions by interested judges, the former prevails.  The Court is the guardian of that right and we will not avoid our

---

[103] *See, e.g.*, *N.Y. State Ass'n of Criminal Def. Lawyers v. Kaye*, 744 N.E.2d 123, 126–27 (N.Y. 2000)  (holding that the rule of necessity compelled the participation of the members of the New York Court of Appeals in a case challenging an administrative directive of that court, because that court "has primary responsibility for the administration of the judicial branch of government, and some administrative rule-making powers are vested exclusively in the Court of Appeals.").

[104] *Id.*; *see also Ignacio v. Judges of U.S. Ct. of Appeals for the Ninth Circuit*, 453 F.3d 1160, 1165 (9th Cir. 2006) (holding that the rule of necessity "should be extended to circumstances like this where a litigant has named uncritically all the judges of this circuit," and rejecting "the contention that the ability to bring in judges from other circuits to hear the case precludes the application of the rule of necessity as this would be the pragmatic equivalent of having the case transferred out of circuit.").

[105] *See* Kurtis A. Kemper, Annotation, *Construction and Application of Rule of Necessity in Judicial Actions, Providing that a Judge Is Not Disqualified to Try a Case Because of Personal Interest If Case Cannot Be Heard Otherwise*, 27 A.L.R. 6th 403 §§ 14–15 (2007) (collecting federal and state cases, including those where plaintiff had sued all of the judges in a jurisdiction or would likely sue any judge assigned).

[106] *In re BellSouth Corp.*, 334 F.3d 941, 956–59, n.7 (11th Cir. 2003).

32

responsibility.[107]

In *Nellius*, an action related to judicial compensation, the rule of necessity required the conflicted members of this Court to hear the case only so long as the Governor declined to exercise his power to appoint unconflicted Justices *ad litem* to sit in their stead.[108]

Later, in *Crosse v. BCBSD, Inc.*, citing the rule of necessity, this Court heard a case involving the health insurer with whom every Justice had coverage without resort to gubernatorial *ad litem* appointments.[109] We observed that under those circumstances, recusal would have been an impracticable result.[110]

All of the Judicial Officers of the Court of Chancery were named as defendants in

---

[107] 402 A.2d 359, 361–62 (Del. 1978).

[108] *See id.* at 362 ("If the matter is not resolved and if the Governor elects not to commission judges Ad litem before argument day, the members of this Court, under the rule of necessity, will grant plaintiffs' application and, notwithstanding their declared interest, will hear and decide this appeal."); *see also* Del. Const. art IV, § 15 ("The Governor shall have power to commission a judge or judges ad litem to sit in any cause in any of said Courts when by reason of legal exception to the Judges authorized to sit therein, or for other cause, there are not a sufficient number of Judges available to hold such Court.").

[109] 836 A.2d 492, 493 n.1 (Del. 2003).

[110] *Id.* *But see Dacey v. Conn. Bar Ass'n*, 441 A.2d 49, 51 (Conn. 1981) (indicating that the rule of necessity would not require a trial court judge, who was disqualified because he was a member of the bar association that was a party in the case, to sit in a case if other judges who were not members of the bar association could be reassigned); *Lorenz v. N.H. Admin. Office of the Courts*, 858 A.2d 546, 549 (N.H. 2004) (recusing the entire New Hampshire Supreme Court in a case challenging an administrative directive of the court, conditioned "upon there being substitute judges available to sit on this case" by designation); *State ex rel. Bardacke v. Welsh*, 698 P.2d 462, 475 (N.M. 1985) (declining to apply the rule of necessity when a judge from another court could be designated to hear a case); *Hooker v. Haslam*, 393 S.W.3d 156, 167 (Tenn. 2012) (stating that even if all the judges in Tennessee would be disqualified because the case implicated an economic interest for all of them (because, for example, the outcome might affect their salaries), the rule of necessity would not apply because Tennessee law contained provisions that would allow the governor to appoint "special judges" with no economic interest in the litigation).

the *DelCOG* Litigation. Thus, Roche contends that the rule of necessity permitted Vice Chancellor Parsons to preside in the Meso Litigation because all of the other members of the court would face the same alleged disqualifying interest—representation by then-Attorney Bouchard in the *DelCOG* Litigation. Meso counters that the rule of necessity did not apply because Delaware law authorizes the Chief Justice to designate a judge of another court to sit in the Court of Chancery.

The trial court did not address this point,[111] and we think it would be unwise for us to do so in the first instance and on a purely advisory basis. We recognize that litigants file in the Court of Chancery based upon its well-deserved reputation of excellence and expertise in deciding certain types of matters. A party's choice of forum is an important aspect of a party's litigation strategy. We also emphasize the paramount importance of avoiding situations where a judge's impartiality might reasonably be questioned as judicial impartiality is fundamental to the administration of justice and the rule of law. Meso is correct that mechanisms exist in Delaware for designating judges from another trial court to handle a matter if all judges on a court are unable to sit on a case.[112] Such a decision to

---

[111] *See Order* at 7–8 (discussing defendants' arguments relating to "official capacity" suits and the rule of necessity, and stating that "[w]hile defendants have raised persuasive arguments on these fronts, I don't reach these questions because I don't have to.").

[112] Del. Const. art IV, § 13(2) empowers the Chief Justice, upon written request from the Chancellor or President Judge of one of the trial courts, or the next most senior Vice-Chancellor or Judge should that position be empty, to assign a Judge or Justice from another court to sit on the requesting court by designation for a specified case and period of time in order to hear and decide the matter. *See, e.g. Humanigen, Inc. v. Savant Neglected Diseases, LLC*, 238 A.3d 194, 198 n.10 (Del. Super. 2020) (appointing a judge of the Superior Court to sit as a Vice Chancellor over a case consolidated from complaints filed in both courts) (citing *Wal-Mart Stores, Inc. v. AIG Ins. Co.*, 2006 WL 3742596, at *4 n.27 (Del. Ch. Dec. 12, 2006)).

apply the rule of necessity and to designate a judge from another trial court to hear the case obviously can potentially affect not only the parties' litigation strategy, but also both courts' resources, particularly in highly complex cases that involve extensive pre-trial, trial and post-trial proceedings. The complications posed by and arising from such dual representations are obvious.[113]

The Vice Chancellor did not decide whether recusal was required in this case, and he concluded that he did not need to reach the constitutional questions "because, even if Meso has identified a due process violation, Meso very clearly has not satisfied the requirement of Court of Chancery Rule 60(b) to obtain relief from a final judgment."[114] We agree.[115] We nevertheless have discussed the ethical principles at some length to reinforce that such dual representation situations should be avoided and that the need for vigilance at the outset of a case is imperative. A judge who finds herself in such a situation should follow the procedure set forth in *Los* — assuming the judge has no actual bias or prejudice, the judge must examine the facts and circumstances of the particular case to determine whether the judge's impartiality might reasonably be questioned. We acknowledge Meso's concerns, and we agree with Meso that even though it asserts no

---

[113] Complicating this matter further is the fact that then-Attorney Bouchard was not counsel of record for the Judicial Officers until after the matter was appealed to the Third Circuit.

[114] *Order* at 9.

[115] *See Downs v. Jacobs*, 272 A.2d 706, 708 (Del. 1970) ("[i]t is the settled policy of this Court that a constitutional question will not be decided unless its determination is essential to the disposition of a case."). As we said in *Downs*, "[w]e consider that policy of judicial restraint to be an important element in the orderly administration of justice." *Id.*

claim of any actual bias or prejudice on his part, the Vice Chancellor, at a minimum, should have disclosed the representation on the record.[116]  Meso then would have had the option of waiving the conflict,[117] or formally seeking the Vice Chancellor's recusal thereby allowing the recusal issues to be addressed in the proceeding directly instead of years later in a collateral challenge to a final judgment after trial where additional issues come into play.[118]

---

[116] *See, e.g. Stevenson v. State*, 782 A.2d at 257 ("When a judge knows, or as soon as a judge discovers, facts that would lead a reasonable person to question his or her impartiality in a particular matter, it is essential that he or she promptly disclose that information.  Following the prompt disclosure of such information, a judge should engage in the two-part inquiry under *Los*. In addition, prompt disclosure of such information permits the timely filing of a motion for recusal, which would require the trial judge to engage in the objective analysis of the appearance of impropriety mandated by *Los*.").

[117] *See* Oral Argument video at 6:30 – 8:39 https://livestream.com/accounts/5969852/events/9376922/videos/214637158/player:

> Meso's Counsel: "[I]t is correct that if he had, if Vice Chancellor Parsons had disclosed this, that the parties could have waived the recusal violation, but he never did."

[118] For example, the Pennsylvania Supreme Court has held that "where the challenge is made for the first time after verdict, in post-trial motions or in arguments and briefs before the appellate courts, different considerations come into play."  *Reilly v. Se. Pa. Transp. Auth.*, 489 A.2d 1291, 1301 (Pa. 1985).  It stated in *Reilly* that:

> Charges of prejudice or unfairness made after trial expose the trial bench to ridicule and litigants to the uncertain collateral attack of adjudications upon which they have placed their reliance.  One of the strengths of our system of justice is that once decisions are made by our tribunals, they are left undisturbed.  Litigants are given their opportunity to present their cause and once that opportunity has passed, we are loathe to reopen the controversy for another airing, save for the greatest of need.  This must be so for the security of the bench and the successful administration of justice.  Accordingly, rules have developed for the overturning of verdicts and judgments for after-acquired evidence.  In our view, recusal motions raised after verdict should be treated no differently than other after-acquired evidence situations which compel the proponent to show that:  1) the evidence could not have been brought to the attention of the trial court in the exercise of due diligence, and 2) the existence of the evidence would have compelled a different result in the case.

With that backdrop, we turn to the Rule 60(b) analysis.

## V.     Rule 60(b) Analysis

Questions concerning the impartiality of a trial court potentially affect the administration of justice in a fundamental way.  It is important that our courts maintain the trust and confidence of the public.  Where such a challenge arises in the context of a collateral attack, and in this case, five years after a full trial on the merits (and before a trial judge who all agree harbored no actual bias), additional public policy considerations must be considered.[119]  Court of Chancery Rule 60(b) is designed to address collateral challenges generally.  Various courts have considered additional factors when the collateral challenges arise in the recusal/disqualification setting as explained next.

"Court of Chancery Rule 60(b) permits a party to seek relief from a final judgment or order."[120]  It recognizes six categories of justification for such relief.  Rule 60(b)(4) applies when "the judgment is void," whereas Rule 60(b)(6) is the residual catchall, applying to "any other reason justifying relief from the operation of the judgment."[121] Relief under this residual category requires a showing of an "extraordinary situation or

---

*Id.* Applying this test, the court dismissed the attempt "to force the recusal of the trial judge in post-trial fashion" since there was no showing that the evidence relied on for recusal was unavailable during trial in the exercise of due diligence or that the existence of the evidence would have compelled a different outcome in the case.  *Id.* at 1302.

[119] Vice Chancellor Parsons entered final judgment in *Meso v. Roche* on June 25, 2014.  Meso filed its complaint seeking vacatur on February 28, 2019.

[120] *MCA, Inc. v. Matsushita Elec. Indus. Co., Ltd.*, 785 A.2d 625, 634 (Del. 2001); *see also Chaverri v. Dole Food Co.*, -- A.3d ---, 2021 WL 99505, at *6 (Del. Jan. 21, 2021) ("Superior Court Rule 60 controls motions to vacate a judgment.").

[121] Del. Ct. Ch. R. 60(b)(6).

circumstances."[122]  Even on such a showing, the movant is "obliged to act without unreasonable delay" in making a Rule 60(b)(6) motion or relief will be denied.[123]

The decision whether to grant vacatur under Rule 60(b)(6) lies in the sound discretion of the trial court and will be disturbed only for an abuse of that discretion.[124]  In exercising its discretion, the trial court must consider two significant public policy objectives, which may be in tension in the particular case before it: "[t]he first is ensuring the integrity of the judicial process and the second, countervailing consideration is the finality of judgments."[125]  However, under Rule 60(b)(4), that discretion is extremely limited, since "either a judgment is void or it is valid."[126]

### A.  Rule 60(b)(4): The Underlying Judgment is Not Void

Meso contends that the Court of Chancery erred in dismissing its claim for relief under Rule 60(b)(4).  Rule 60(b)(4) allows a judgment to be vacated if the judgment is "void."  Roche contends that the Vice Chancellor correctly held that recusal violations render a judgment voidable, as opposed to void.  We agree with Roche.

---

[122] *Jewell v. Div. of Soc. Servs.*, 401 A.2d 88, 90 (Del 1979).  Recently we reiterated that, "[r]elief under Rule 60(b)(6) is an extraordinary remedy which requires a showing of 'extraordinary circumstances.'"  *Chaverri*, -- A.3d ---, 2021 WL 99505, at *6.

[123] *Schremp v. Marvel*, 405 A.2d 119, 120 (Del. 1979) (per curiam).

[124] *Cox v. Gen. Motors Corp.*, 239 A.2d 706, 707 (Del. 1967).

[125] *MCA, Inc.*, 785 A.2d at 634.

[126] *Id.* at 634, n.8 (quoting 11 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2862 (1995)); *see also Carter v. Fenner*, 136 F.3d 1000, 1005 (5th Cir. 1998) ("When, however, the motion is based on a void judgment under rule 60(b)(4), the [trial court] has no discretion, the judgment is either void or it is not.") (quoting *Recreational Props., Inc. v. Sw. Mortg. Serv. Corp.*, 804 F.2d 311, 313–14 (5th Cir. 1986)).

38

Our decision in *Copeland v. Manuel*[127] virtually controls Meso's first issue on appeal. Except for the most extreme cases, as discussed below, a challenge to the judge's impartiality sounds in voidability, not voidness, and is outside the bounds of Rule 60(b)(4). In *Copeland*, two judges recused themselves during the conduct of a civil suit involving a dentist, resulting in the case's transfer to a third judge. The dentist ceased attending pretrial conferences thereafter, and failed to attend the trial, resulting in a judgment against him. After the plaintiff executed judgment and the scheduling of a sheriff sale of the dentist's property, the dentist belatedly moved under Rule 60(b) to vacate on the grounds that the judgment impermissibly relied on pretrial orders from the recused judges.[128]

In denying relief, this Court reiterated the common law rule that "the judgments of disqualified judges were deemed as voidable but not void."[129] We determined that a Rule 60(b) attack on the judge's impartiality requires a showing of "extraordinary circumstances," suggesting that Rule 60(b)(6) applies and not Rule 60(b)(4).

Meso, citing *Copeland*, acknowledges in its opening brief that "mere recusal violations do not create 'void' judgments under Rule 60(b)(4),"[130] but argues that the United States Supreme Court in *Caperton v. A.T. Massey Coal Co.* modified and superseded this rule, rendering the judgment void "if the failure to recuse is so severe that

---

[127] 653 A.2d 304, 1994 WL 665257 (Del. Nov. 22, 1994) (TABLE).

[128] *Id*. at *1.

[129] *Id*. at *2.

[130] *See* Op. Br. at 16 ("To be sure, mere recusal violations do not create 'void' judgments under Rule 60(b)(4)") (citing *Copeland*, 1994 WL 665257, at *2).

it deprives a litigant of due process."[131]  But *Caperton* was a case on direct appeal from an appellate court decision in which the allegedly conflicted jurist participated.[132]  The *Caperton* Court made no mention of Rule 60(b) at all, and made no comment on when a judgment is void.[133]

Moreover, Meso's claim presents none of the factual scenarios that *Caperton* identified as sufficiently extreme to presume a violation of due process.  First, as *Caperton* acknowledges, actual bias is disqualifying.[134]  Here, Meso does not argue that Vice Chancellor Parsons was actually biased.  In fact, it affirmatively agrees that he was not.  Other scenarios identified  in *Caperton* that could constitute a violation of due process are when "a judge ha[s] a financial interest in the outcome of a case,"[135] or when a judge "participat[es] in an earlier proceeding" in the case in the effective capacity as a

---

[131] *Id.* (citing *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 877 (2009)).

[132] *Caperton*, 556 U.S. at 875–76.

[133] Accordingly, the Court of Chancery concluded that neither *Caperton* nor *Williams v. Pennsylvania*, 136 S.Ct. 1899 (2016) changed the "traditional" view that failures to recuse fall outside Rule 60(b)(4).  *Order* at 12–13.

[134] *See Caperton*, 556 U.S. at 881, 883 (although proof of actual bias is not required, "actual bias, if disclosed, no doubt would be grounds for appropriate relief.").

[135] *Caperton,* 556 U.S. at 877–78 (discussing *Tumey v. Ohio*, 273 U.S. 510 (1927) (holding that the defendant was deprived of due process where judge's compensation was derived from fines assessed in cases over which he presided)).

prosecutor.[136]  Another is when a judge "becomes embroiled in a running, bitter controversy" with a litigant.[137]  None of those apply here.

The Supreme Court in *Caperton* also made clear that a failure to comply with a state's judicial conduct rules does not necessarily translate into a due process violation. Constitutional principles operate on matters of recusal as well, since due process "guarantees 'an absence of actual bias' on the part of a judge."[138]  As the Supreme Court explained, the Due Process Clause "demarks only the outer boundaries of judicial disqualifications."[139]  States remain free to impose more rigorous recusal standards than what the Due Process Clause requires.[140]  Consequently, as the Supreme Court recognized,

---

[136] *Id*. at 880–81 (discussing *In re Murchison*, 349 U.S. 133, 133 (1955) (holding that the judge could not preside over the defendant's trial for contempt when he had acted as a 'one-man grand jury' in bringing the contempt charges.)).

[137] *Id*. at 881 (discussing *Mayberry v. Pennsylvania*, 400 U.S. 455, 465 (1971) (judge 'vilified' by defendant could not preside over defendant's criminal contempt proceedings as "[n]o one so cruelly slandered is likely to maintain that calm detachment necessary for fair adjudication.")).

[138] *Williams v. Pennsylvania*, 136 S. Ct. 1899, 1905 (2016).  *See also Caperton*, 556 U.S. at 876 ("It is axiomatic that a fair trial in a fair tribunal is a basic requirement of due process.") (internal quotation and alteration omitted)); *Los*, 595 A.2d at 383 ("The requirement that judges be impartial is a fundamental principle of the administration of justice.  To that end, rules of disqualification have evolved to ensure that no judge shall preside in a case in which he is not disinterested and impartial.  As a matter of due process, a litigant is entitled to neutrality on the part of the presiding judge but the standards governing disqualification also require the appearance of impartiality.").

[139] *Caperton*, 556 U.S. at 889.

[140] *Id*.  *See also Margoles v. Johns*, 660 F.2d 291, 296 (7th Cir. 1981) (stating that "[a] litigant is denied the fundamental fairness to which he is constitutionally entitled if the judge of his case is unfairly biased against him.  However, a litigant is not denied due process by either the 'appearance' of partiality or by circumstances which might lead one to speculate as to a judge's impartiality. A litigant is denied due process if he is in fact treated unfairly.").  Thus, the Seventh Circuit found the standards set forth by the federal recusal statute to be "largely irrelevant" and the cases based on it "not particularly helpful" to resolving the Rule 60(b)(4) motion to vacate the

most disputes over disqualification will be resolved without resort to the Constitution.[141]

Following *Caperton*, in *United Student Aid Funds, Inc. v. Espinosa*, the United States Supreme Court emphasized that "Rule 60(b)(4) applies only in the rare instance where a judgment is premised either on a certain type of jurisdictional error or on a violation of due process that deprives a party of notice or the opportunity to be heard."[142] Thus, the courts have declined to find an unconstitutional risk of bias except in a few extreme circumstances.[143] Meso acknowledged throughout these proceedings that it has no case supporting its view that a failure to recuse would fall within Rule 60(b)(4).[144]

---

judgment based on an alleged violation of due process because the federal recusal statute "goes beyond 'due process.'" *Id.*

[141] *Id.* at 890.

[142] 559 U.S. 260, 271, 130 S. Ct. 1367, 1377, 176 L. Ed. 2d 158 (2010); *see also id.* at 270 ("[t]he list of . . . infirmities" that will render a judgment void is "exceedingly short; otherwise, Rule 60(b)(4)'s exception to finality would swallow the rule.").

[143] *See, e.g., Johnson v. Morales*, 946 F.3d 911, 918 n.3 (6th Cir. 2020) (the Supreme Court "has declined to find an unconstitutional risk of bias in all but a few narrow circumstances"); *United States v. Williams*, 949 F.3d 1056, 1061–62 (7th Cir. 2020) (discussing the "limited set of circumstances" where due process requires recusal); *United States v. Richardson*, 796 F. App'x 795, 799–800 (4th Cir. 2019) (unpublished decision) (rejecting due process claim that did not involve any of the "extraordinary situation[s]" in which the Supreme Court has held that "the Constitution requires recusal") *cert. denied* 140 S. Ct. 2750 (2020).

[144] *See* Oral Argument video at 17:58 – 18:15 https://livestream.com/accounts/5969852/events/9376922/videos/214637158/player:

> Meso's Counsel: "To your first question, that is correct, we do not have a case where there is a due process violation for an appearance of impartiality, of bias under *Caperton* and *Williams* that rendered the judgment void."

*See also Order* at 12 (observing that "Meso has not cited a single case where the Court vacated a judgment under Rule 60(b)(4) for a judge's alleged unconstitutional failure to recuse.").

As a matter of pleading, Meso's complaint falls well short of alleging any such extreme circumstance. The Court of Chancery found that even though Meso had access to the records in both the *Meso v. Roche* case as well as the *DelCOG* litigation, "the best the complaint can muster is that Vice Chancellor Parsons 'may' have felt a 'debt of gratitude' to then-attorney Bouchard."[145] The court also concluded that "Meso's vague and conclusory allegations in paragraph 33 of the complaint that Vice Chancellor Parsons 'may' have had communications with then-attorney Bouchard concerning the federal litigation that 'touch[ed] [up]on' Meso's 'case' is not even close to being well-pled."[146] We agree with the trial court that Meso's allegations, which are merely speculative and conclusory, do not rise to the level of alleging unconstitutional bias that would render the judgment void under Rule 60(b)(4).

### B. Meso Fails to Plead Extraordinary Circumstances

Meso's Rule 60(b)(6) argument fares no better. Where a litigant seeks Rule 60(b)(6) relief based on a failure to recuse, we endorse and adopt the two-part test used by the Court of Chancery. A litigant must show that she acted promptly and without delay to seek relief upon learning of the alleged conflict, *and* that the alleged conflict was of an extraordinary character as analyzed under the three *Liljeberg* factors. The Court of Chancery correctly determined that Meso has done neither.

At the outset, the Court of Chancery examined the careful language in Meso's

---

[145] *Id.* at 7.

[146] *Id.* at 22.

pleading as to its lack of knowledge of the dual representation. The relevant language in Meso's complaint is that "[t]he investigation confirmed that no one at Meso was aware of Mr. Bouchard's representation of Vice Chancellor Parsons."[147] The court found that Meso had not pled that its agents, including its former counsel, were unaware of the representation and, therefore, "Meso is not entitled to reasonable inferences flowing from facts it has not pled."[148] We agree with the Court of Chancery's decision not to infer facts that were not pled.

But even setting aside that aspect of the delay analysis, the Court of Chancery found Meso's delay in seeking Rule 60(b)(6) relief unreasonable and incompatible with the timeliness requirement. A party seeking relief under Rule 60(b)(6) is "obliged to act without unreasonable delay."[149] Whether a delay is reasonable or not is a matter committed to the sound discretion of the trial judge.[150] To find an abuse of that discretion, "there must be a showing that the trial court acted in an arbitrary and capricious manner."[151]

---

[147] App. to Op. Br. at A021 (Complaint).

[148] *Order* at 18 ("With no allegation that its attorneys were ignorant of the unrelated and highly publicized federal litigation, and now-Chancellor Bouchard's representation of the members of the Court of Chancery in that case, it is not reasonable to infer Meso has exercised diligence as is required under Rule 60(b)(6) and our Supreme Court's 2009 decision in *Shipley vs. New Castle County*."); *see also Copeland*, 1994 WL 665257, at *2 ("A party who fails to raise a disqualification issue may not seek to set aside the results of a trial when knowledge of the disqualification was known to the party during trial.").

[149] *Schremp*, 405 A.2d at 120.

[150] *Brown v. Comegys*, 567 A.2d 34, 1989 WL 90728, at *1 (Del. July 31, 1989) (TABLE).

[151] *Tumlinson v. Advanced Micro Devices, Inc.*, 81 A.3d 1264, 1268 (Del. 2013) (quoting *Spencer v. Wal–Mart Stores E., LP*, 930 A.2d 881, 887 (Del.2007)).

Meso makes no such showing. To the contrary, the record supports the court's decision not to credit Meso's justification that its delay was founded on difficulties in obtaining counsel. Of the year-long delay, Meso explains that it took half that time to obtain lead counsel, and the other half to obtain local Delaware counsel. The trial court was justifiably troubled by "Meso's alleged wandering from firm to firm over the course of a year -- particularly when it knew that the judgment it would seek to vacate was already three years old."[152] Further, the trial court specifically noted that Meso's eventually-obtained local Delaware counsel was plaintiff's counsel in the *DelCOG* Litigation.[153] We conclude that the Court of Chancery did not abuse its discretion in determining that, under the particular circumstances of this case, Meso's delay was unreasonable.

Where a Rule 60(b)(6) application is untimely, we need not reach the merits of the underlying claim for relief,[154] which in the case of an alleged failure to recuse is whether the conflict was of an "extraordinary character," considering the *Liljeberg* factors. But, for the sake of completeness, we also find no error with that aspect of the Court of Chancery's analysis.

---

[152] *Order* at 19. As we recently decided, a trial court is within its discretion to find a seven month wait unreasonable if it finds the litigant's justification for delay inadequate. *Chaverri*, -- A.3d ---, 2021 WL 99505, at *9.

[153] *Order* at 19 ("Although not ultimately dispositive, I take judicial notice of the fact that [Meso's] search coincidently led it to the same Delaware firm that represented the coalition in the federal litigation.").

[154] *Schremp*, 405 A.2d at 120.

45

The three *Liljeberg* factors relevant in Rule 60(b)(6) motions for undisclosed conflicts are (1) the risk of injustice to the parties in the particular case, (2) the risk that the denial of relief will produce injustice in other cases, and (3) the risk of undermining the public's confidence in the judicial process.[155]

As to the first factor, Meso readily concedes that Vice Chancellor Parsons was unbiased as to them.[156] Absent Rule 60(b)(6) relief, Meso remains bound by an adverse judgment entered against it but that judgment occurred following trial before a judge who Meso admits harbored no actual bias. By contrast, the Court of Chancery noted that granting relief inflicts on Roche the reopening of a case long-since completed, with the attendant expense and difficulty of re-litigating that which was already litigated to completion.[157] The court found that Meso had failed to allege anything other than vague and conclusory allegations relating to a risk of injustice. We agree with the Court of Chancery's assessment of the complaint and the conclusion that "[t]o support that serious charge [of injustice] under Rule 8 and the Rule 12(b)(6) standard, Meso would need to

---

[155] 486 U.S. at 864. The United States Supreme Court's analysis is fact-specific and allows room for some element of harmless error. *See id.* at 862 ("As in other areas of the law, there is surely room for harmless error committed by busy judges who inadvertently overlook a disqualifying circumstance."). Here, the trial court found that "Meso has not overcome the *Liljeberg* harmless error admonition." *Order* at 21.

[156] *E.g.* App. to Ans. Br. at B349 (Motion to Dismiss Oral Argument Transcript) ("We [Meso] are in no way impugning the motives, intentions, actions other than the failure to observe the rules by Vice Chancellor Parsons. We have tried to make that clear in our papers. If we haven't, I'd like to make it clear this morning. We hold him in the highest possible regard.").

[157] *Order* at 21 (finding that, "[v]acatur would severely prejudice defendants who prevailed after a five-day trial in Meso's unsuccessful appeal to our Supreme Court," and that, "on the other hand, Meso has not well-pled that it will suffer an injustice if it is denied relief.").

muster well-pled factual allegations, not mere speculation."[158]  We agree that the first

*Liljeberg* factor thus weighs strongly against relief.

As to the second factor — the risk that denial of relief will produce injustice in other cases — Meso concedes that other litigants are unlikely to suffer injustice absent relief. Before the trial court, Meso stated its belief that, had Vice Chancellor Parsons disclosed the conflict in every case for which then-Attorney Bouchard appeared before him, parties in many cases would have waived the conflict and in the remaining cases presumed they would have been satisfied by having other attorneys at his firm handle the case instead.[159] This concession weighs against a finding of extraordinary circumstances.

As for the third factor of undermining public confidence in the judicial process, for judges' "own" counsel in an unrelated matter to appear before them does have the potential to create the appearance of bias before the public against which all authorities caution.  We agree with Meso that Vice Chancellor Parsons should have disclosed Mr. Bouchard's representation of him on the record.  Our discussion above discusses generally other factors that a court would consider in any recusal analysis if the parties, following disclosure on the record, had chosen not to waive the conflict.  We emphasize the importance of maintaining the public's confidence in the judicial system and of guarding against situations where a judge's impartiality might reasonably be questioned.  But ultimately, in

---

[158] *Order* at 22.

[159] *See id*. at 349–50 ("Had notice been given, in many of these cases, I'm quite confident, parties would have waived their rights.  It wouldn't have been all 25 cases.  Other attorneys at then-Attorney Bouchard's firm could have handled them.").

considering all three factors, we agree with the Vice Chancellor that "[o]n this complaint, it is not reasonable to infer Vice Chancellor Parsons' alleged judicial ethics violation -- even assuming it occurred -- caused any reasonably conceivable harm, much less serious harm."[160]

Accordingly, we agree with the trial court's conclusion that these circumstances do not give rise to relief under Rule 60(b)(4) or Rule 60(b)(6).

## VI.    Conclusion

For the forgoing reasons, we AFFIRM the judgment of the Court of Chancery.

---

[160] *Order* at 23.